1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9  CASCADIA WILDLANDS, et al.,                    CASE NO. 3:15-cv-05132-RJB

10                 Plaintiffs,                    ORDER ON CROSS-MOTIONS FOR
                                                 SUMMARY JUDGMENT
11        v.

12  ROGER A. WOODRUFF, et al.,

13                 Defendants.

14

15        THIS MATTER comes before the Court on cross-motions for summary judgment filed

16  by Plaintiffs (Dkt. 23) and Defendants (Dkt. 31). The Court has considered the responsive

17  pleadings of Plaintiffs and Defendants (Dkt. 31, 34, 40), an amicus brief from the Washington

18  Department of Fish and Wildlife (WDFW) (Dkt. 37), oral argument by the parties, and the

19  remainder of the file herein.

20                        I.        BACKGROUND

21        Plaintiffs, who allegedly live and recreate near gray wolves, seek to prevent Wildlife

22  Services, a federal agency, from any involvement in gray wolf management in Washington. Dkt.

23  22, at 3. Plaintiffs challenge administrative actions by Wildlife Services to issue an

24  Environmental Assessment (AR 19-137) and Decision Notice and Finding of No Significant

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 1

Impact (FONSI) (AR 5-18). Dkt. 22. According to Plaintiffs, Wildlife Services failed to meet its

National Environmental Protection Act obligations by failing to consider a reasonable range of

alternatives (Claim 1), take a hard look at the environmental effects of the Proposed Action

Alternative (Claim 2); and prepare an Environmental Impact Statement (EIS) (Claim 3).

      The stated purpose of the Environmental Assessment is to "evaluate[] a proposed action

and alternatives [for Wildlife Services] to assist [WDFW], the United States Fish and Wildlife

Service (USFWS), and Native American tribal governments with management of gray wolf . . .

conflicts throughout the state." AR 23. Wildlife Service's involvement "may include technical

assistance, harassment, lethal removal, live-trapping, collaring, translocation, and monitoring

wolves." *Id*. According to the Environmental Assessment, Wildlife Services' assistance helps

WDFW to implement its Wolf Conservation and Management Plan (AR 16279) by diverting

WDFW's focus "on conservation and recovery instead of capture or removal." AR 24, 93, 94.

*See also*, AR 8305, 8306. Removal methods, including lethal action, "may be necessary to

resolve repeated wolf-livestock conflicts and . . . to [improve] public tolerance for overall wolf

recovery . . . [and] to protect public safety." AR 24. The Environmental Assessment describes a

procedure for wolf removal, and WDFW has formalized a non-mandatory lethal removal

protocol in furtherance of the Wolf Conservation and Management Plan. AR 54, 17022-28.

      The Environmental Assessment describes and discusses the environmental consequences

of three alternatives: no action, eliminating Wildlife Services' current program, and the Proposed

Action Alternative, the latter of which Wildlife Services adopted. AR 44-85, 142-144. Public

comment on a draft of the Environmental Assessment was solicited starting on December 17,

2013, with Wildlife Services receiving letters, including letters from Plaintiffs, and thousands of

comments. AR 37, 38, 657-8189, 10128-10212. *See* AR 8257. The final draft of the

1 | Environmental Assessment, formally adopted through the FONSI signed by Wildlife Services on

2 | August 20, 2015, includes Wildlife Services' responses to public comments. AR 5-18, 37, 117-

3 | 33. Prior to Wildlife Services issuing its draft Environmental Assessment, Wildlife Services and

4 | WDFW signed a Cooperative Service Agreement requiring Wildlife Services to "assist with wolf

5 | management activities at the request of WDFW." AR 8329. *See also*, AR 8333, 8336, 8339.

6 | II.     SUMMARY JUDGMENT STANDARD

7 | Summary judgment is proper only if the pleadings, the discovery and disclosure materials

8 | on file, and any affidavits show that there is no genuine issue as to any material fact and that the

9 | movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is

10 | entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

11 | showing on an essential element of a claim in the case on which the nonmoving party has the

12 | burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of

13 | fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

14 | the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

15 | (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

16 | metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a

17 | material fact exists if there is sufficient evidence supporting the claimed factual dispute,

18 | requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

19 | *Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

20 | *Association*, 809 F.2d 626, 630 (9th Cir.1987).

21 | The determination of the existence of a material fact is often a close question. The court

22 | must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

23 | e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect.*

24 |

1  *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

2  of the nonmoving party only when the facts specifically attested by that party contradict facts

3  specifically attested by the moving party. The nonmoving party may not merely state that it will

4  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

5  to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

6  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

7  be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

8                                   III.    DISCUSSION

9  1.  Standing

10      Defendants challenge Plaintiffs' standing in their cross-motion. Dkt. 31, at 16-22. *See*

11  *also*, Dkt. 37, at 3-6.  Defendants' motion should be denied, because Plaintiff has made the

12  requisite showing for standing under Article III of the United States Constitution.

13      Standing under Article III requires (1) a concrete, particularized, and actual or imminent

14  injury ("injury") (2) that is fairly traceable to the challenged conduct ("causation") (3) and is

15  likely to be redressed by a favorable ruling ("redressability"). *Clapper v. Amnesty Intern. USA*,

16  133 S.Ct. 1138, 1147 (2013); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

17          *a.  Injury*

18      A plaintiff alleging procedural injury, such as a violation of NEPA, "must show that the

19  procedures in question are designed to protect some threatened concrete interest of his that is the

20  ultimate basis of his standing." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148,

21  1154 (9th Cir.2015), quoting *W. Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 485 (9th

22  Cir.2011)(internal quotations omitted). For an environmental interest to be a "concrete injury,"

23  there must be a "geographic nexus between the individual asserting the claim and the location

24

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 4

suffering an environmental impact." *Id.* "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

Applied here, Plaintiffs have sufficiently pleaded a concrete injury. The procedures that Wildlife Services allegedly violated are designed to protect Plaintiffs' aesthetic and recreational enjoyment of gray wolves and other wildlife, and Plaintiffs allege that their enjoyment in specified geographic areas will be lessened if Wildlife Services is not prevented from assisting WDFW with activities that are predicated on violated administrative procedures. *See,* e.g., Dkt. 22, at 7, 10; Dkt. 24, at 3, 4. Defendants argue that Plaintiffs have not shown an injury because Plaintiffs cannot show that Wildlife Services causes any more injury than WDFW, when it is WDFW that makes removal decisions that would be executed without Wildlife Services' assistance. Dkt. 40, at 6, 7. However, although WDFW possesses the ultimate authority for removal of wolves, the record shows a need for assistance, without which WDFW's ability to execute the Wolf Conservation and Management Plan would be adversely affected. AR 94, 8306. In fact, Defendants concede at least a short term change to the number of likely removals without assistance. *Id.*

b. *Causation*

Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, "the causation and redressability requirements are relaxed." *W. Watersheds Project,* 632 F.3d at 485. Consideration of causation requires an analysis of whether the alleged injury is fairly traceable to the defendant, while determining redressability "requires an analysis of whether the

1  court has the power to right or to prevent the claimed injury." *Barnum Timber Co. v. U.S. E.P.A.*,

2  633 F.3d 894, 899 (9th Cir.2011).

3       Defendants rightly point out that *WildEarth Guardians* "stands for the proposition that

4  'the mere existence of multiple causes of injury does not defeat redressability, particularly for a

5  procedural injury.'" Dkt. 40, at 6, citing 795 F.3d at 1157. This case is distinguishable from

6  *WildEarth Guardians*, Defendants argue, because unlike the "shared responsibility" between

7  Wildlife Services and the State of Nevada for a predator management program, in this case

8  WDFW has its own program that it operates without Wildlife Services' "entirely redundant"

9  assistance, so there is only one, not two, causes of injury. Dkt. 31, at 21. At oral argument

10  Defendants emphasized this point, arguing that Wildlife Services acts as a contractor to carry out

11  specific requests of WDFW with no discretion or shared responsibility.

12       Defendants overstate the narrowness of WDFW's engagement with Wildlife Services and

13  understate Wildlife Service's discretion and shared responsibility. Defendants at oral argument

14  relied upon the Cooperative Service Agreement as controlling of the relationship between the

15  parties. The agreement does refer multiple times to wolf management activities of Wildlife

16  Services taken "at the request of WDFW," but the agreement lacks specifics about what the

17  WDFW requests could include. *See* AR 8329, 8333, 8336, 8339. Although the Environmental

18  Assessment and FONSI insist that Wildlife Services "would abide by the [Wolf Conservation

19  and Management Plan]," AR 36, the agreement makes no such limitation. *See* 8329-8340.  Even

20  if Wildlife Services is limited by the Wolf Conservation and Management Plan, the plan itself is

21  not mandatory for either WDFW or Wildlife Services and is subject to changes and additions,

22  allowing for room for discretionary acts by Wildlife Services. The Environmental Assessment

23  also contemplates considerable discretion to be exercised by Wildlife Services:

24

1

> Upon receiving a request from WDFW . . . [Wildlife Services] would use its Decision Model (Figure 3) (Slate et al. 1992) to determine the appropriate method of removal based on allowable methods (foot-hold traps, foot snares, shooting, or aerial shooting) under [the Wolf Conservation and Management Plan] or similar guidance, and consultation with WDFW[.]" AR 54.

2

3

4  Underlining that discretion, the Environmental Assessment also notes that Wildlife Services has

5  decided that its action with tribal lands is conditional: "[Wildlife Services] would only agree to

6  lethal removal on tribal lands under similar guidance [of the Wolf Conservation and

7  Management Plan]."AR 54. Because under the Cooperative Services Agreement, Wildlife

8  Services retains considerable discretion and may share responsibility for wolf management

9  activities, the Environmental Assessment and FONSI issued by Wildlife Services are inadequate;

10  thus Wildlife Services is a cause of Plaintiffs' injury.

11           *c.  Redressability*

12           Considering redressability, Defendants argue that there is no evidence that WDFW will

13  remove any less wolves without Wild Service's assistance or that Wildlife Service's assistance

14  makes lethal removal easier, so Plaintiffs' alleged injury cannot be remedied. Dkt. 31, at 17-20.

15  According to Defendants, this case is distinguishable from *WildEarth Guardians* and analogous

16  to *Goat Ranchers of Oregon v. Williams*, 379 F. App'x 662 (9th Cir.2010), an unpublished case,

17  because the state-operated Plan will continue without assistance from Wildlife Services, like a

18  cougar removal plan implemented by the State of Oregon. However, as discussed with relation to

19  injury above, it appears that without Wildlife Services' assistance, at least temporarily, less gray

20  wolves may be removed under the Wolf Conservation and Management Plan due to insufficient

21  resources. AR 94 ("We are requesting [Wildlife Services] assistance . . . because we do not have

22  the capacity to adequately address the level of conflict we have experienced"). *See also*, AR

23  8306.

24

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 7

1    Even if Defendants are correct—that the number of wolf removals will remain the same

2    without assistance from Wildlife Services—Plaintiffs' injury can still be redressed by vacating

3    the Environmental Assessment and FONSI. Under the Environmental Assessment, Wildlife

4    Services retains discretion to decide whether to use "foot-hold traps, foot snares, shooting, or

5    aerial shooting" and the factors to consider, such as "location and land jurisdiction; land uses. . .

6    possible presence of humans, pets and non-target wildlife[,]" yet Wildlife Services insists that it

7    works solely "at the direction" of WDFW. AR 54. To reconcile this inconsistency, it must be

8    concluded that although WDFW oversees and authorizes Wildlife Services' actions in general,

9    Wildlife Services may still retain considerable discretion. To the extent that, if Plaintiffs prevail,

10   Wildlife Services could either narrow the contractual scope of its involvement with wolf

11   management or prepare an EIS that sufficiently accounts for this discretion, rather than ignoring

12   it, Plaintiffs' injury can be redressed.

13   Plaintiffs have made a showing as to all three elements required for Article III standing.

14   Defendants' cross-motion for summary judgment on this issue should be denied.  Plaintiffs and

15   Defendants request summary judgment in their favor as to each claim, now addressed in turn.

16   2.   Claim One: Failure to Consider Reasonable Range of Alternatives

17   NEPA requires that federal agencies such as Wildlife Services "[r]igorously explore and

18   objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The alternatives section

19   is the "heart" of an Environmental Impact Statement. § 1502.14. Although "an agency's

20   obligation to consider alternatives under an [Environmental Assessment] is a lesser one than

21   under an [Environmental Impact Statement]," *Native Ecosystems Council v. U.S. Forest Serv.*,

22   428 F.3d 1233, 1245, 1246 (9th Cir.2005), "NEPA requires that alternatives . . . be given full and

23

24

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 8

1    meaningful consideration[.]" *Id.* (alteration in original; internal quotations omitted). *See also*,

2    *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir.2013).

3            In this case, Wildlife Services considered three alternatives: (1) no action, (2) eliminating

4    Wildlife Service's current Wolf Assistance Program, and (3) the Proposed Action Alternative.

5    AR 44-85, 142-144. According to Plaintiffs, this was not enough; Wildlife Services should have

6    considered another alternative, namely, restricting lethal control efforts to private lands only.

7    Dkt. 23, at 42-45; Dkt. 34, at 15, 16. *See* AR 118, 119. Plaintiffs posit that Wildlife Services

8    cursorily rejected this reasonable alternative by concluding without authority that its involvement

9    is "all or nothing" and could not be limited to just private land. Dkt. 23, at 42, 43; Dkt. 34, at 15,

10   16.

11            "Those challenging the failure to consider an alternative have a duty to show that the

12   alternative is viable," *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th

13   Cir.2013), and this is a burden that Plaintiffs have not met, either in their briefing or through

14   their public comments. *See* Dkt. 23, at 40-44 and AR 118, 119, 8078, 8079. Most

15   problematically, no explanation is provided as to why the proposed alternative would advance

16   gray wolf conservation. AR 8078, 8079. Where a proposed alternative is not viable, it is not

17   reasonable. *City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir.1986); *Friends of the Earth v.*

18   *Coleman,* 513 F.2d 295, 298 (9th Cir.1975). Therefore the proposed alternative, restricting lethal

19   control to private lands, is not reasonable. Because Wildlife Services only has a duty to consider

20   only reasonable alternatives, Wildlife Services has satisfied its duty under NEPA and did not act

21   arbitrarily, capriciously, or contrary to law. *See* § 1502.14. Summary judgment as to this claim

22   should be denied as to Plaintiffs and granted in favor of Defendants.

23   3.   Claim Two: Failure to Disclose and Analyze the Direct, Indirect, and Cumulative Impacts of
         the Proposed Action and Its Alternatives

24

NEPA requires Wildlife Services to take a "hard look" at the likely environmental effects of the proposed action. *Native Ecosystems,* 428 F.3d at 1239. Taking a "hard look" includes "considering all foreseeable direct and indirect impacts," *N. Alaska Envtl. Ctr. V. Kempthorne,* 457 F.3d 969, 975 (9th Cir.2006) (internal quotation marks omitted). The analysis must be "more than perfunctory," and "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive detail could not be provided." *Klamath-Siskiyou Wildlands Ctr. V. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir.2004).

According to Plaintiffs, Wildlife Services did not take hard look at the effect of lethal wolf removal on gray wolf populations, their ecosystems, and non-target animals. Dkt. 23, at 25-32; Dkt. 31, at 26, 27. *See* AR 126 (discussion of lethal removal as "not controversial among agency researchers and experts"). Having considered the record as a whole, in this Court's assessment, whether Wildlife Services took a hard look at the effects of lethal wolf removal turns on a narrow portion of the record. *See* AR 13-15, 79-83, 126.

First, it is apparent from the record that Wildlife Services failed to take a hard look at the effects of lethal removal on gray wolf populations. The lack of consideration is deliberate; Wildlife Services does not analyze the effects on gray wolves because "WDFW, USFWS, [and] tribes are responsible for determining the number of wolves to remove and would respond if [Wildlife Services] could not." AR 80. This is a problematic response, because it deflects from the fact that Wildlife Services has discretion to decide whether and under what circumstances to engage in wolf removal, including lethal and non-lethal removal, discretion Wildlife Services apparently would not hesitate to exercise under some circumstances, such as when engaging with tribal lands. *See* AR 54 ("[Wildlife Services] would only agree to lethal removal on tribal lands under similar guidance [of the Wolf Conservation and Management Plan]"). The response also

1  ignores the fact that without Wildlife Services, WDFW acknowledges at least a short term effect

2  on the number of removals, and the longer term attainability of the plan without Wildlife

3  Services's assistance is predicated on speculation of legislative intervention to increase funding.

4  *See* AR 93, 94. And while a thorough consideration may overlap with findings in the Wolf

5  Conservation and Management Plan, that plan is not binding on Wildlife Services and is subject

6  to changes and additions. AR 122. *See, e,g.,* AR 17022 (Protocol for Lethal Removal is

7  "guidance"). *See also*, AR 8329. At the very least, a hard look at the effects of lethal removal on

8  gray wolf populations would provide Wildlife Services with a clear structure and boundaries for

9  engagement with the state plan.

10          Second, Wildlife Services failed to take a hard look at the ecological effects of lethal wolf

11 removal. *See* AR 66, 67 ("Issues Not Analyzed in Detail, with Rationale"). "Ecological" refers to

12 the interaction and relationship between a species—in this case, gray wolves— and its

13 environment. *See, e.g., Sierra Forest Legacy v. U.S. Forest Serv.*, 652 F. Supp. 2d 1065, 1086

14 (N.D. Cal. 2009). Wildlife Services deliberately failed to consider the ecological effects of lethal

15 wolf removal on the basis that it "would not result in a negative effect to wolves in WA, because

16 if [Wildlife Services] did not remove the wolf, WDFW would conduct the removal or contract

17 with a private party[.]" AR 67. This logic fails for the same reasons it failed to excuse Wildlife

18 Services from taking take a hard look at the effect of lethal removal on gray wolf populations: it

19 ignores Wildlife Services' shared responsibility and discretion, assumes a specific, but uncertain

20 outcome if Wildlife Services did not provide assistance, and presumes that the Wolf

21 Conservation and Management Plan is static and mandatory.  Wildlife Services erred by not

22 taking a hard look at the ecological effects of lethal removal.

23

24

1    Finally, considering whether Wildlife Services took a hard look at non-target animals, it

2    is worth noting that Wildlife Services took the initiative to solicit formal USFWS input regarding

3    non-target species under the Endangered Species Act, discussing the findings in the

4    Environmental Assessment. AR 81, 82. This may constitute a hard look, but even if so, it is of no

5    consequence, because Wildlife Services failed to take a hard look at other issues, and because an

6    Environmental Impact Statement should have been generated. (see below.)

7    In sum, although Wildlife Services may have taken a hard look at the effects of lethal

8    removal on non-target species, Wildlife Services did not take a hard look at the ecological effects

9    of lethal removal or its effect on gray wolf populations. Summary judgment as to this claim

10    should be denied as to Defendants but granted in favor of Plaintiffs.

11    4.   Claim Three: Failure to Prepare Environmental Impact Statement

12    An Environmental Impact Statement ("EIS") is required for all "major Federal actions

13    significantly affecting the quality of the human environment." 1068 42 U.S.C. § 4332(2)(c). If an

14    agency determines an EIS is not required, it must issue a brief explanation of its reasons in a

15    Finding of No Significant Impact, which may incorporate or summarize an environmental

16    assessment. 40 C.F.R. § 1508.13. Courts reviewing a decision not to prepare an EIS "employ[s]

17    an arbitrary and capricious standard that requires us to determine whether the agency has taken a

18    'hard look' at the consequences of its actions, based [its decision] on a consideration of the

19    relevant factors, and provided a convincing statement of reasons to explain why a project's

20    impacts are insignificant." *Envtl. Prot. Info. Ctr. V. U.S. Forest Serv.* ("*EPIC* "), 451 F.3d 1005,

21    1009 (9th Cir.2006) (citation and internal quotation marks omitted).

22    Whether the action "significantly" affects the quality centers on two factors: context,

23    which requires analysis of an action's impact at multiple levels (e.g.- regional, national, local),

24

1   and intensity, which is the "the severity of the impact." 40 C.F.R. § 1508.27. *See also Nat'l*

2   *Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 731 (9th Cir.2001). Intensity is evaluated

3   by enumerated factors, which may individually or collectively constitute sufficient intensity to

4   require an EIS. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th

5   Cir.1998).

6        The parties dispute several of the enumerated factors: whether the effects on the quality

7   of the human environment are likely to be highly controversial; the degree to which possible

8   effects are highly uncertain or involve unique or unknown risks; unique geographic

9   characteristics of the area; the degree to which the action adversely effects threatened or

10  endangered species; and whether the action is cumulatively significant in its impact. AR 23, at

11  33-40; Dkt. 31, at 33-39.

12       *a.  Likely to be highly controversial*

13       An action is "highly controversial" if there is "a substantial dispute [about] the size,

14  nature, or effect of the major Federal action rather than the existence of opposition to a use."

15  *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir.1988). *See* § 1508.27(b)(4).

16  Although Defendants correctly argue that mere numeric opposition—in this case, public

17  comments numbering in the thousands—does not necessarily make an action highly

18  controversial, the content of that opposition raises substantial questions about the size, nature,

19  and effect of the action. The nature of the action is at issue, for example, by the significant

20  disagreement among experts regarding the effectiveness of removal to address depredation, a

21  question summarily dismissed Wildlife Services. *See* AR 125. The effect of the action is at issue

22  because, for example, although Wildlife Services pledges to abide by the Wolf Conservation and

23  Management Plan in the Environmental Assessment itself, the Cooperative Services Agreement

24

1  does not limit Wildlife Services' assistance to just implementing that plan, and the plan itself is

2  not specific about when lethal versus non-lethal removal should be used. *See* AR 16279. It also

3  appears that Wildlife Services may have the discretion to employ its own lethal removal

4  protocols, which raises significant questions about the effect of the action. *C.f.* AR 57 and AR

5  17022. The action is highly controversial, and this factor weighs heavily in favor of preparation

6  of an EIS.

7       *b.  Highly uncertain*

8       When considering whether an action is highly uncertain, preparation of an EIS "is

9  mandated where uncertainty may be resolved by further collection of data, or where the

10  collection of such data may prevent speculation on potential . . . effects." *Native Ecosystems*

11  *Council*, 428 F.3d at 1240. *See* § 1508.27(b)(5). According to Plaintiffs, it is highly uncertain

12  whether lethal wolf removal actually reduces livestock depredation. This argument has merit,

13  given the dispute within the scientific community, AR 125, warranting further collection and

14  consideration of data. Defendants' argument that the action is not highly uncertain because

15  Wildlife Services uses the same tools "but with more precision and a lower possibility of non-

16  target takes," Dkt. 31, at 37, fails to address the underlying anticipated impact of Wildlife

17  Services' action. The argument also ignores the uncertainty in outcome should WDFW not be

18  able to rely on Wildlife Services for assistance, or if WDFW requests assistance from Wildlife

19  Services in much broader areas of wolf management, beyond removal, as allowed under the

20  broad terms of the Cooperative Services Agreement. This factor favors preparation of an EIS.

21       *c.  Unique geographic characteristics*

22       An action may also require an EIS where it has unique geographic characteristics, "such

23  as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and

24

1  scenic rivers, or ecologically critical areas." § 1508.27(b)(3). Plaintiffs opine that "it is possible"

2  that Wildlife Services' action could involve ecologically sensitive areas, such as those designated

3  as habitat for threatened or endangered species, designated Wilderness areas, national parks, and

4  occupied wolf habitat. Dkt. 23, at 34, 35. Plaintiffs may be correct, but Plaintiffs articulate no

5  specifics about the unique geographic characteristics, other than to argue that gray wolves may

6  be present generally, which is insufficient. *C.f., e.g., Ocean Mammal Institute v. Gates*, 546

7  F.Supp.2d 960, 978 (designated sanctuary for humpback whales is ecologically critical area).

8  This factor neither favors nor disfavors preparation of an EIS.

9         *d.   Threatened or endangered species*

10         If an action adversely affects an endangered species or its habitat, then preparation of an

11  EIS may be needed. § 1508.27(b)(9). Consideration focuses on the species as a whole, rather

12  than individuals of that species. *Envt'l. Prto. Info. Ctr. V. U.S. Forest Serv.,* 451 F.3d 1005, 1010

13  (9th Cir.2006). Where USFWS issues an incidental take statement, AR 147-596, like in this case,

14  "anticipating the loss of some members of a threatened species does not automatically lead to the

15  requirement to prepare a full EIS." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1276

16  (10th Cir. 2004). At issue in this case is whether the results of the Biological Opinion, AR 147-

17  596, should be interpreted as describing a significant impact sufficient to require an EIS. In this

18  Court's view, Plaintiffs overstate the significance of the impact of Wildlife Services' actions on

19  the gray wolf, by failing to mention that the vast majority of anticipated wolf removals are non-

20  lethal. Considering the significance of the impact on other species, the fact that the Biological

21  Opinion concludes that Wildlife Services' actions "may affect" but are "not likely to affect"

22  Canada lynx, and that the actions may result in the incidental take of one grizzly bear under a

23

24

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 15

1  "reasonable worst-case scenario" do not in and of themselves necessitate an EIS. Therefore, this

2  factor only slightly favors preparation of an EIS.

3       *e.   Cumulative impact*

4       A cumulative impact on the environment "results from the incremental impact of the

5  action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R.

6  § 1508.7. In determining whether a project will have a "significant" impact on the environment,

7  an agency must consider "[w]hether the action is related to other actions with individually

8  insignificant but cumulatively significant impacts," 40 C.F.R. § 1508.27(b)(7), and if so, the

9  agency should pursue an EIS. *Blue Mtns. Biodiversity Project*, 161 F.3d at 1214. According to

10  Defendants, the Court need not consider this factor, because Wildlife Services cannot be a

11  legally relevant cause of wolf recovery as an entity acting at the direction of WDFW, but this

12  argument ignores the discretion and shared responsibility that Wildlife Services may exercise.

13  Wildlife Services erred by not preparing an EIS that considered the cumulative impact of its

14  actions, under circumstances where Wildlife Services' impact on wolf conservation and

15  population management may be significant, and where Wildlife Services' consideration offered

16  little more than general, and oral, agreements to limit Wildlife Services' role in the Wolf

17  Conservation and Management Plan. AR 93, 94, 8305, 8306.

18       Wildlife Services acted arbitrarily and capriciously and contrary to law by not preparing

19  an EIS. Although aspects of Wildlife Services' consideration under the Environmental

20  Assessment and FONSI were sufficiently thorough, Wildlife Services misjudged the scope of its

21  responsibility by deferring to WDFW, rather than diligently considering issues that may arise

22  under the potentially broad scope of involvement in the Wolf Conservation and Management

23

24

1   Plan. Summary judgment as to this claim should be denied as to Defendants but granted in favor

2   of Plaintiffs.

3                                IV.   <u>CONCLUSION</u>

4          This is a case where the Administrative Record did not support the reported agreements

5   between WDFW and Wildlife Services, leaving the potential for substantial management of the

6   Washington gray wolf population in the hands of Wildlife Services without the benefit of an EIS.

7   In summary, Wildlife Services failed to observe its NEPA obligations, by not preparing an EIS

8   and not taking a hard look at significant issues. Wildlife Services repeatedly but erroneously falls

9   back on the position that it need not do so because it only intends to act at WDFW's direction.

10  Had the contractual relationship between WDFW and Wildlife Services been more narrowly

11  prescribed, perhaps that would be a tenable position, but relying on the Cooperative Services

12  Agreement is unavailing. The Environmental Assessment repeats Wildlife Services' intent to be

13  bound to the Wolf Conservation and Management Plan, which has more detail, but even if

14  binding on Wildlife Services, the plan is subject to changes or additions by WDFW, giving the

15  public scant recourse. Although further consideration by Wildlife Services may have overlapped

16  considerably with the Wolf Conservation and Management Plan, at a minimum, further

17  consideration would have clarified the boundaries of Wildlife Services' engagement with

18  WDFW and would have better served the purpose of NEPA, to "help public officials make

19  decisions that are based on understanding of environmental consequences[.]"  40 § CFR 1500.1.

20                               V.    <u>RELIEF</u>

21         Because NEPA is "essentially a procedural statute, [a] district court's review . . . is

22  governed by the [Administrative Procedure Act.]"  *Salmon River Concerned Citizens v.*

23  *Robertson*, 32 F.3d 1346, 1356 (9th Cir.1994). Under the APA, courts may vacate agency

24

1   decisions, setting them aside on the basis that they are "arbitrary, capricious, an abuse of

2   discretion, or otherwise not in accordance with law . . . or without observance of procedure

3   required by law[.]" 5 U.S.C. § 706(b).

4          Given the above NEPA errors, the Environmental Assessment and FONSI should be

5   vacated. Wildlife Services may engage with WDFW in wolf management activities only to the

6   extent it did so prior to the Environmental Assessment and FONSI. The decision of how to

7   proceed—whether to prepare an EIS, renegotiate a narrower scope of involvement with WDFW,

8   or abandon assistance efforts entirely—rests with Wildlife Services.

9                                      VI.   <u>ORDER</u>

10         Therefore, it is hereby **ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt.

11  23) is GRANTED IN PART as to Claim 2 and Claim 3 and DENIED IN PART as to Claim 1.

12  Defendants' Cross-Motion for Summary Judgment (Dkt. 31) is GRANTED IN PART as to

13  Claim 1 and DENIED IN PART as to Defendants' challenge of Plaintiffs' standing, Claim 2, and

14  Claim 3.

15         It is **FURTHER ORDERED** that the Environmental Assessment and Finding of No

16  Significant Impact are vacated. Wildlife Services shall not take any further wolf management

17  actions in Washington under the Proposed Action Alternative, but shall observe the status quo in

18  place prior to the Environmental Assessment and FONSI.

19         Attorneys fees and costs are not awarded to either party.

20         The Clerk is directed to send uncertified copies of this Order to all counsel of record and

21  to any party appearing pro se at said party's last known address.

22

23

24

1    Dated this 17th day of December, 2015.

2

3

4                        ROBERT J. BRYAN
                         United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT- 19